UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW McLOSKEY,

                             Plaintiff,                    Civil Action No. 14-11305
                                                    Honorable Denise Page Hood
                                                    Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                             Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 19]**

      Plaintiff Matthew McLoskey ("McLoskey") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [17, 19], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

      For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that McLoskey is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [19] be DENIED, McLoskey's Motion for Summary Judgment [17] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.     REPORT

### A.     Procedural History

On June 22, 2011, McLoskey filed applications for DIB and SSI, alleging a disability onset date of September 11, 2009.  (Tr. 135-47).  These applications were denied initially on October 19, 2011.  (Tr. 91-95).  McLoskey filed a timely request for an administrative hearing, which was held on June 25, 2012, before ALJ Melody Paige.  (Tr. 47-83).  McLoskey, who was represented by attorney Eva Guerra, testified at the hearing, as did vocational expert Kelly Stroker.  (*Id.*).  On October 25, 2012, the ALJ issued a written decision finding that McLoskey is not disabled.  (Tr. 29-41).  On March 7, 2014, the Appeals Council denied review.  (Tr. 1-6).  McLoskey timely filed for judicial review of the final decision on March 31, 2014.  (Doc. #1).

### B.     Background

#### 1.     Disability Reports

In an undated disability report, McLoskey indicated that his ability to work is limited by bipolar disorder, depression, mania, schizoaffective disorder, and "mental illness."  (Tr. 175).  McLoskey earned a Bachelor's degree in 2002 and a Master's degree in 2007.  (Tr. 176, 181).  He worked in a call center, as an information technology consultant, and as a software project coordinator, but he asserts that the stress associated with his divorce, as well as family issues, caused him to become so depressed he was eventually unable to work.  (Tr. 175-76).  McLoskey reported treating with several doctors and therapists regarding his medical conditions and taking numerous medications, including Abilify, Ambien, Ativan, Chantix, Depakote, haloperidol, Lexapro, lithium, Risperdal, Wellbutrin, and Zyprexa.  (Tr. 178-80).

In a function report dated July 17, 2011, McLoskey reported that he was staying on his sister's couch but was "essentially homeless."  (Tr. 208).  He indicated that his daily activities include taking his medication, doing "various chores," going for a walk, and sometimes sleeping.

2

(Tr. 208-09).  McLoskey indicated that he is able to prepare his own meals on a daily basis; however, when he is depressed, he does not eat or cook.  (Tr. 210).  Indeed, he indicated that he had had "some trouble" a few months earlier and had not eaten for four days.  (Tr. 209).  He claimed he is able to do dishes, water plants, do laundry, drive, pay bills, and handle a checking and savings account.  (Tr. 210-11).  He spends time with others but does not go anywhere on a regular basis.  (Tr. 212-13).  When asked to identify functions impacted by his conditions, McLoskey checked memory, completing tasks, concentration, understanding, and following instructions.  (Tr. 213).  He can only pay attention for fifteen minutes at a time, is unable to finish what he starts, and does not handle stress or changes in routine well.  (Tr. 213-14).  When asked whether he has any "unusual behavior or fears," McLoskey indicated that he "began to feel as if people at [his] job were talking about [him]."  (*Id.*).

In a third-party function report dated July 18, 2011, McLoskey's ex-wife, Meghan McLoskey, provided additional, detailed information about McLoskey's mental condition and functioning.  (Tr. 184-91).  When asked to describe what her ex-husband does on a daily basis, Ms. McLoskey said:

> There were years where Matthew couldn't get out of bed and would sleep for 16+ hours.  The lowest forms of depression/manic/bipolar episodes he couldn't bathe, eat … basically he can't function.  Other years Matthew would wake up make coffee and then just sit around – he had looked for work but didn't do anything around the house even.  At times – many times he couldn't sleep then it would be days that he couldn't sleep and then he'd have a mental break.

(Tr. 184).  When asked about McLoskey's personal care habits, Ms. McLoskey indicated that he "doesn't wash his clothes," he wears the same thing for weeks at a time ("even underwear"), often does not bathe or shave, has to be told to wash and cut his hair, and goes "for weeks not eating."  (Tr. 185).  She indicated that he needs reminders to take his medication; at one point, he ran out of his medication for a week and had a psychotic episode.  (Tr. 186).  She indicated that

3

his ability to prepare his own meals is "very, very sporadic" and that he "wouldn't eat for days." (*Id.*).   Other than washing dishes – which takes him "hours" – he does no chores around the house.  (*Id.*).  Ms. McLoskey indicated that, for the previous 3 ½ years, McLoskey did not go outside; he "became a hermit" and would only leave for family functions or holidays and would then "want to leave immediately."  (Tr. 187-88).  She indicated that McLoskey is unable to pay bills or handle a checking or savings account, saying that he is "unaware of when things [are] due."  (Tr. 187-88).  She further reported that McLoskey enjoys playing guitar, reading, and playing games, but no longer does any of these things because he is too depressed and lacks concentration.  (Tr. 188).  Ms. McLoskey indicated that McLoskey has "difficulty completing tasks," does not finish what he starts, and does not handle stress or changes in routine well.  (Tr. 189-90).  When asked whether McLoskey has any "unusual behavior or fears," she indicated that he "gets very 'out there' with topics to talk about … and just rambles on."  (Tr. 190).

In an undated disability appeals report, McLoskey indicated that he had had "several breakdowns in the past year."  (Tr. 219).  He further stated:

> I know that it looks from the evidence that I may very well be able to handle a job, but I am not.  Though I can sometimes carry out routine activities at work, my memory is messed up, my mental illness can at whim cause severe changes in my thinking abilities and behavior.  I worked with Dr. Kezlarian over ten years, I think it is important to re-review medical records from him, specifically the time I ended up harming myself (Almost killing myself in pubic [sic]) on a Virginia highway. Right now, at this point in my life, is the closest I have been to that day, in a long time.  I'm divorced, I have no car, I have no home.  These things are depressing.  My depression is currently reaching a boiling point and sometimes it's damn near impossible to cope.

(Tr. 221).

### 2.    McLoskey's Testimony

At the June 25, 2012, hearing before the ALJ, McLoskey testified that he is divorced and was living in his parents' house.  (Tr. 62-63).  He is able drive, but typically drives only to and

from his mental health appointments. (Tr. 63). He was taking lithium and Abilify, which did not cause side effects. (Tr. 65-66). He indicated that he has "more energy" on these medications than on previous prescriptions (Risperdal, Haldol), but he also does not have "full relief of symptoms such as hearing voices in traffic or white noise …." (Tr. 66).

McLoskey testified that, in May 1999, he had a breakdown; he attempted suicide by severing his penis on a public highway because he was hearing voices in traffic. (Tr. 58-59). He had subsequent breakdowns in 2002 and 2006, which forced him to drop classes he was taking, but otherwise he "was able to succeed at some things in life in between that time and the present time." (Tr. 59-60).

McLoskey testified that he had problems "on and off" throughout his entire adult life, but worked up until 2010. (Tr. 57). He further testified that, in 2008, when he was working as an IT consultant, he "began hearing voices and worrying that people at work were talking about [him]." (Tr. 57). He was terminated from that job and subsequently took another temporary job, which lasted only one week because he was unable to concentrate. (Tr. 57-58). He would go outside the office to smoke and was "hearing voices in the traffic," which agitated him. (Tr. 58). He was fired from this job too. (Tr. 59). Fundamentally, McLoskey says that he cannot work because he has to "take days off when [he] simply can't cope with [his] own mind, let alone those people around [him]." (Tr. 67).

When asked what he does on a daily basis, McLoskey said "not much." (Tr. 67). He tries to sleep, and when he cannot, he becomes restless. (*Id.*). He suffers from depression, saying that he might wake up feeling "sunny and cheerful," but something always hits him the wrong way, and he just wants to "turtle" (i.e., lay in bed and completely isolate himself). (Tr. 74). If he is not sleeping, he is usually "just kind of ruminating," hoping that things will get

5

better.  (Tr. 74-75).  He hears voices daily – sometimes it is just "idle chatter," but other times it is "terrible harassment."  (Tr. 75).  He describes hearing these voices as "debilitating," saying that when he hears them, he becomes withdrawn and angry and cannot concentrate.  (Tr. 75-76).

3.    *Medical Evidence*

The record suggests that McLoskey's psychiatric problems began in 1999, when he was admitted to a hospital in Virginia.  (Tr. 270, 380).  Apparently, he had not slept for eight days and had impulsively driven from Detroit to Florida in 20 hours.  (Tr. 270).  He heard "voices in the traffic" and, while standing in the middle of a highway, severed his penis with a piece of glass in a suicide attempt.  (Tr. 270, 380).  Police arrived, and he was hospitalized and diagnosed with schizophrenia.  (Tr. 270).  After this incident, McLoskey treated for years with Jeffrey Kezlarian, M.D., at William Beaumont Hospital on an out-patient basis.  (Tr. 265, 380).

The first treatment notes in the record are from October 2008, when McLoskey was being prescribed Risperdal and Lexapro for his psychiatric problems.  (Tr. 267).  By May 2009, McLoskey had lost his job and his car, at least in part because of his mental impairments.  (Tr. 265, 375).  By July 28, 2009, Dr. Kezlarian noted that McLoskey had been "actively psychotic" for two or three weeks; he increased McLoskey's Risperdal dose and added Abilify to his medication regimen.  (Tr. 264).

On July 30, 2009, McLoskey was admitted to Oakland Hospital after being transferred from Beaumont, where he had been taken by his family, who indicated that McLoskey was "losing touch with reality."  (Tr. 375, 380).  He was admitted via a petition for involuntary admission and certification, as he had refused the inpatient psychiatric treatment recommended by his psychiatrist for his "safety and stabilization."  (Tr. 380).  Eventually, however, McLoskey agreed to a voluntary admission.  (Tr. 384).

Upon admission, McLoskey's Global Assessment of Functioning ("GAF")[1] score was 10. (Tr. 381). His wife (who later divorced him) reported that McLoskey had been going "in and out of [] reality" for several days. (Tr. 381). McLoskey reported that he had not been sleeping; he had difficulty organizing his thoughts; he had racing thoughts and was feeling confused; he was easily distracted; he believed people were following him; and he was "constantly hearing voices that are coming from inside and outside." (*Id.*). Indeed, during one group therapy session, McLoskey revealed that he had been "isolating and literally talking to walls/TV since he was laid off from his job." (Tr. 419). At the time of his discharge, six days later, his diagnosis was bipolar mood disorder, depressed, and his GAF score was 50. (Tr. 375). He was prescribed Abilify, Ambien, and lithium. (Tr. 376).

On September 16, 2009, McLoskey began treatment at St. John Health with Bernadette Angeles, M.D. (Tr. 270-73). Dr. Angeles noted that McLoskey had recently been diagnosed with bipolar disorder after being hospitalized for a "manic switch upon trial of Lexapro." (Tr. 270). By the time Dr. Angeles saw McLoskey, he was doing well on lithium and Abilify. (*Id.*). He reported that his mood was stable and denied racing thoughts, anxiety, or psychosis. (*Id.*). On examination, McLoskey had a bright affect, good mood, was pleasant and calm, and demonstrated adequate concentration, memory, and judgment. (Tr. 270-71). Dr. Angeles diagnosed McLoskey with bipolar I disorder, most recent episode manic, severe, in near remission, and assigned him a GAF score of 75. (Tr. 271). McLoskey saw Dr. Angeles for medication reviews on three other occasions between September 2009 and June 2010. (Tr. 273-76). Each time, he reported that he was doing well on his current medications, with full

---

[1] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

remission of his mood symptoms.  (*Id.*).

On November 29, 2010, McLoskey sought outpatient psychiatric care at Easter Seals. During the intake assessment, McLoskey indicated that his symptoms were "stable" on lithium and Abilify, but he had not worked since 2008.[2]  (Tr. 355).  His eye contact was good, he was cooperative and forthcoming, and his hygiene and grooming were good.  (*Id.*).  He was diagnosed with bipolar disorder, most recent episode depressed, unspecified.  (Tr. 364).

McLoskey began seeing Easter Seals' psychiatrist Surjeet Bagga, M.D., on December 10, 2010.  Dr. Bagga noted that McLoskey had run out of lithium and Abilify because he no longer had insurance benefits through his wife.  (Tr. 347).  Dr. Bagga agreed with the diagnosis of bipolar disorder and assigned McLoskey a GAF score of 50.  (Tr. 352).  On March 16, 2011, Dr. Bagga conducted a psychiatric evaluation of McLoskey, at which time he noted that McLoskey had a history of going through manic episodes "where he is hyper, cannot concentrate, cannot focus, and cannot sleep and feels like he is all wired up."  (Tr. 339).  McLoskey's diagnosis remained bipolar disorder, and his GAF score was still 50.  (*Id.*).  Dr. Bagga increased McLoskey's dose of lithium in order to "keep him stabilized in the community and avoid decompensation."  (*Id.*).

Two weeks later, however, McLoskey's wife called Easter Seals, reporting that McLoskey was "not sleeping," was "hyper irritable," had "vague thinking," and was also "tangential."  (Tr. 324).  McLoskey expressed feeling as though he was a "tuning fork," feeling other people's problems and emotions, and also as though he was in a place "where time does not matter."  (*Id.*).  He was making gestures in the air "like writing," and he felt that the lithium was making him "hyper sensitive," rather than calming him down.  (*Id.*).  On examination,

---

[2] McLoskey actually worked at a call center in June and July 2010.  (Tr. 160, 275).

McLoskey was aloof and anxious with a labile affect and tangential thinking. (Tr. 326). As a result, Dr. Bagga added Ativan and Abilify to McLoskey's previously-prescribed lithium. (Tr. 329-30).

At his next visit to Easter Seals, on April 13, 2011, McLoskey reported doing slightly better – his mind was not racing, although he still had some irritability and was only "less" delusional. (Tr. 317). His GAF score remained 50 and he was also prescribed Cogentin. (Tr. 322). When McLoskey presented for a mental health assessment on May 10, 2011, he reported having had a "breakdown about a month ago," when he did not sleep for three days and disappeared "into his own world." (Tr. 313). At the time, however, McLoskey reported feeling better and denied any symptoms of depression. (*Id.*). At a May 26, 2011, medication review, McLoskey indicated that he had run out of medication for four days, the result of which was that he had not slept for three days, was talking to himself, and was responding to internal stimuli. (Tr. 300). His hygiene was poor, his mood was expansive, his affect was labile, his psychomotor activity was hyperactive, and his speech was pressured. (Tr. 301). He reported experiencing auditory hallucinations, as well as "paranoia that people are trying to control him." (*Id.*). McLoskey's clinical status was described as unstable, and his Ativan dosage was temporarily increased in order to avoid hospitalization. (Tr. 301, 304).

When McLoskey next saw Dr. Bagga, on June 10, 2011, he again reported that when he ran out of his medication for a few days, he "was not sleeping and [was] responding to internal stimuli." (Tr. 292). Once he was back on his medication, however, he was sleeping better, his thinking was clear, and he was not hearing voices. (*Id.*). McLoskey did not return to Easter Seals until September 2, 2011; in the interim, he had moved in with his parents. (Tr. 285). Although he reported that his mood swings were better, his attitude was guarded, his mood was

9

dysphoric, his affect was constricted, and his GAF score remained 50.  (Tr. 285, 290).

McLoskey began treating at Training and Treatment Innovations ("TTI") in November 2011.  At his intake visit, he reported an incident earlier that year when he took 35 Ativan because he could not sleep; he claimed this was not a suicide attempt, but indicated that he recognized it "could have led to harm/death."  (Tr. 462).  At a psychiatric evaluation on December 16, 2011, his diagnosis was bipolar I disorder, most recent episode mixed, unspecified, and his GAF score was 55.  (Tr. 478).  McLoskey remained compliant with treatment and medication over the next few weeks.  (Tr. 449-50, 453-56).

At a visit to TTI on February 23, 2012, McLoskey indicated that he was "starting to hear voices" which "sometimes could be the TV but he feels that the TV is talking to him specifically."  (Tr. 447).  He indicated that he believed a recent change in his lithium medication was causing these symptoms.  (*Id.*).  His affect was very flat, and he was "unfocused throughout much of the conversation."  (*Id.*).  When he met with Humera Athar, M.D., a few days later, McLoskey indicated that he continued to hear voices, despite the fact that his lithium dose had been lowered.  (Tr. 438).  He also reported that he had begun thinking of the possibility of having been "sexually molested by his therapist during hypnosis" in the early 1990's, since that therapist apparently "went to prison in 1997 after having other sexual molestation charges." (*Id.*).  The very next day, February 29, 2012, McLoskey met with his case manager and described feeling that he "has multiple personality disorder because he is hearing a lot of voices and they all have different sounds and personalities."  (Tr. 436).  He further indicated that he was "'learning' about his past from the voices" and they are "revealing things to him that he must have suppressed," such as the fact that he had been molested by a therapist as a child.  (*Id.*).

On March 8, 2012, McLoskey reported "spending a lot of time alone in his room" and

10

"sleeping a lot." (Tr. 434). The next week, he reported "gradually feeling better," and "working on trying to spend more time with his parents even though he wants to be alone most of the time." (Tr. 432). Then, at his last recorded visit to TTI, on May 31, 2012, McLoskey indicated that he did not wish to continue therapy at TTI "due to the fact that he believes he needs hypnosis therapy to reveal the parts of his past that he cannot remember." (Tr. 430).

On June 11, 2012, McLoskey underwent a consultative psychosocial assessment and employability evaluation with Elaine Tripi, Ph.D. (Tr. 367-73). Dr. Tripi observed that McLoskey was unkempt and anxious, with a flat/blunted affect and a retarded speech pattern. (Tr. 367). When asked about his current symptoms, McLoskey complained of poor concentration, an inability to focus or pay attention to tasks, disturbed sleep, fearful thoughts, and auditory and visual hallucinations. (*Id.*). He further indicated that he hears "a chatter of voices on a daily basis," but he has difficulty understanding what they are saying, which is "very agitating to him." (*Id.*). He mainly stays at home, has no friends, and is fairly isolated from his parents. (Tr. 368). Dr. Tripi diagnosed McLoskey with bipolar I disorder, most recent episode mixed, severe, with psychotic features, and assigned him a GAF score of 46. (*Id.*). She described his symptoms as "florid and active." (*Id.*).[3]

---

[3] The record also contains additional medical records from Dr. Kezlarian, to whom McLoskey apparently returned for treatment in July 2013. (Tr. 8-18, 485-96). These records, which were first submitted to the Appeals Council and were not reviewed by the ALJ, cannot be considered for purposes of substantial evidence review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) (where the Appeals Council denies review of the ALJ's decision, evidence first submitted to the Appeals Council cannot provide a basis for deeming the ALJ's decision unsupported by substantial evidence). However, the Court notes that when these records were submitted in conjunction with a new application for benefits, McLoskey allegedly was granted full benefits at the initial application level, dating back to December 26, 2012 (the date of his request for review in the instant case). (Doc. #17 at 20). The Commissioner does not challenge McLoskey's assertion about being awarded full benefits in connection with his subsequent application.

### 4. Vocational Expert's Testimony

Kelly Stroker testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 77-82).  The VE characterized McLoskey's past relevant work as ranging from semi-skilled to skilled in nature, and from sedentary to medium in exertion.  (Tr. 79).  The ALJ asked the VE to imagine a claimant of McLoskey's age, education, and work experience, who is able to perform work at all exertional levels, but only if it is simple, routine, and repetitive in nature, with no fast-paced production standards.  (Tr. 80).  The VE testified that the hypothetical individual would not be capable of performing McLoskey's past relevant work.  (*Id.*).  However, the VE testified that the hypothetical individual would be capable of working in the positions of janitor (10,000 jobs in southeast Michigan), dishwasher (5,000 jobs), office cleaner (8,000 jobs), and parking lot attendant (1,500 jobs).  (Tr. 80-81).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that McLoskey is not disabled under the Act.  At Step One, the ALJ found that McLoskey has not engaged in substantial gainful activity since September 11, 2009, his alleged onset date.  (Tr. 31).  At Step Two, the ALJ found that McLoskey has the severe impairment of bipolar disorder.  (Tr. 31-32).  At Step Three, the ALJ found that McLoskey's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 32-33).

The ALJ then assessed McLoskey's residual functional capacity ("RFC"), concluding that he is capable of performing work at all exertional levels, with the following non-exertional limitations:  the work must be simple, routine, and repetitive in nature, and it must not involve fast-paced production standards.  (Tr. 33-39).

13

At Step Four, the ALJ determined that McLoskey is unable to perform any of his past relevant work.  (Tr. 39-40).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that McLoskey is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 40-41).  As a result, the ALJ concluded that McLoskey is not disabled under the Act.  (Tr. 41).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

14

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

In his motion for summary judgment, McLoskey argues that the ALJ erred in concluding that he does not satisfy Listing 12.04 ("Affective Disorders"), asserting that the evidence of record demonstrates that he does, in fact, meet the "paragraph B" criteria of this Listing. (Doc. #17 at 22-28). To satisfy the "paragraph B" criteria, in relevant part, McLoskey must show that his mental impairments result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.04. A marked limitation means "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.00(C). Here, however, the ALJ concluded that McLoskey has only mild limitations in activities of daily living, maintaining social functioning, and maintaining

15

concentration, persistence, or pace.  (Tr. 32).  McLoskey challenges the ALJ's findings in each of these respects.

"Activities of daily living" include adaptive abilities, such as cleaning, shopping, cooking, paying bills, maintaining a residence, using the telephone, and caring for one's grooming and hygiene.  *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.00(C)(1).  In concluding that McLoskey has only a mild limitation in this area, the ALJ wrote:

> With regard to activities of daily living, the claimant stated that he does not do much all day, but tries to help his parents or spend time outside while he smokes cigarettes.  In Function Reports provided by the claimant and his ex-wife, it was reported that, at times, he had to be reminded to care for his personal needs.  There were times when he went days without eating, shaving, washing his clothes, or showering.  Despite this testimony, the claimant stated that, when he is symptomatic, he has difficulty doing simple chores, such as brushing his teeth or taking a shower. (Exhibits 4E and 6E).
>
> While the undersigned recognizes that claimant's symptoms may affect his motivation to complete activities of daily living, there is no support for the aforementioned allegations.  He consistently presented to his treating psychiatrists with good hygiene and grooming, and even reported independence with his activities of daily living.  He never indicated that he was having persistent difficulties caring for his personal needs, or that he needed reminders for these tasks.  Moreover, claimant has not had long periods where he has been actively symptomatic.  Rather, his symptoms have recurred intermittently secondary to medication adjustments; these recurrences were short-lived and ceased as soon as he was put back on a lower dosage of his medications.  Additionally, the claimant readily admitted to his psychiatrists that he enjoyed playing guitar, gardening, and writing, and even expressed a desire to sing in a gospel choir.  As such, the claimant exhibits no more than mild limitations in his ability to care for his activities of daily living.

(Tr. 38-39).

In support of her conclusion that McLoskey is only mildly limited in activities of daily living, the ALJ found that "there is no support for [his] allegations" that he has to be reminded to care for his personal needs; at times goes days without eating, shaving, washing his clothes, or showering; and has difficulty performing even simple chores.  (Tr. 38).  As discussed below, the

16

Court finds that the ALJ's conclusion in this regard is not supported by substantial evidence.

First, if credited, McLoskey's allegations would certainly seem to suggest much more than a "mild" limitation in activities of daily living. *See, e.g., Grabowski v. Colvin*, 2014 WL 5817210, at *5-6 (E.D. Mich. Nov. 10, 2014) (finding marked limitation in activities of daily living where plaintiff was unable to pay bills, needed encouragement to perform household chores, wore the same clothes and neglected to shower for three days, and needed reminders to take medication).

Turning to the ALJ's analysis, the Court notes that although the ALJ cited in passing to the third-party function report completed by McLoskey's ex-wife, the ALJ did not make any credibility finding with respect to Ms. McLoskey's statements, nor did the ALJ explain her apparent wholesale rejection of them. Although an ALJ need not discuss each piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, she still must fairly weigh the overall record, and the failure to reconcile significant competing evidence against that which the ALJ finds to guide her decision, can warrant remand. *See, e.g., Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499-500 (6th Cir. 2012) (mischaracterization of activities of daily living, coupled with other errors, warranted remand); *Roberts v. Colvin*, 2015 WL 181658, at *10 (E.D. Mich. Jan. 14, 2015) (noting that while ALJ need not discuss all record evidence, "the quality and volume of evidence not discussed by the ALJ may 'raise[ ] serious doubts about the supportability of the ALJ's RFC finding' and overall conclusions") (quoting *Wilcox v. Comm'r of Soc. Sec.*, 2014 WL 4109921, at *7 (E.D. Mich. Aug.19, 2014)).

Here, the ALJ should have discussed Ms. McLoskey's detailed and specific report which articulated McLoskey's ongoing difficulties with activities of daily living, and weighed that report against other record evidence. Specifically, Ms. McLoskey indicated that her ex-husband

17

"doesn't wash his clothes"; wears the same thing for weeks at a time ("even underwear"); often does not bathe or shave; has to be told to wash and cut his hair; goes "for weeks not eating"; and needs reminders to take his medication. (Tr. 185-86). She further indicated that McLoskey's ability to prepare his own meals is "very, very sporadic"; he does no chores (other than washing dishes, which takes him "hours"); and he is unable to pay bills. (Tr. 186-88). And, despite the fact that the ALJ cited McLoskey's statement that he "enjoyed playing guitar" as evidence that he is only mildly limited in activities of daily living (Tr. 39), Ms. McLoskey specifically indicated that McLoskey no longer plays the guitar because he is too depressed and lacks concentration. (Tr. 188).

The Commissioner argues that the ALJ rejected Ms. McLoskey's statements because they were "inconsistent with other evidence in the record." (Doc. #19 at 13 (citing Tr. 38-39)). The problem with this assertion is twofold. First, the ALJ did *not* explicitly reject Ms. McLoskey's statements; rather, she actually cited to her third-party function report in purported support for her finding that McLoskey has mild limitations in activities of daily living. (Tr. 38). And, second, the record evidence with which Ms. McLoskey's statements are purportedly "inconsistent" consists primarily of statements made by McLoskey to his treatment providers, the reliability of which are questionable at best. For example, the ALJ asserts that McLoskey "reported independence with his activities of daily living" and "never indicated that he was having persistent difficulties caring for his personal needs, or that he needed reminders for these tasks." (Tr. 38-39). Even assuming this to be true, the Court agrees with McLoskey that, under the circumstances, he might not be "the best person to be able to opine as to the severity of his own mental impairment." (Doc. #17 at 30). As set forth above, McLoskey reported to his providers in November 2010 that he had not worked since 2008, despite the fact that he had

18

worked at a call center just a few months earlier.  (Tr. 160, 275, 355).  Similarly, at his initial

TTI intake, McLoskey denied ever having attempted suicide, despite previously having

acknowledged that he was hospitalized following a suicide attempt where he allegedly cut

himself while in the middle of a highway.  (Tr. 270, 380, 462).  Thus, it certainly appears to the

Court that McLoskey might not be entirely reliable when it comes to reporting the full extent of

his mental health symptoms.  However, the ALJ did not address these inconsistencies or

adequately weigh the underlying information against Ms. McLoskey's report.  Accordingly, the

Court cannot conclude that the ALJ's finding that McLoskey is only mildly limited in activities

of daily living is supported by substantial evidence.

The same is true with respect to the ALJ's conclusion that McLoskey has only a mild

limitation in maintaining social functioning.  Social functioning refers to an individual's capacity

to interact appropriately and communicate effectively with others, including family members,

friends, neighbors, coworkers, and merchants.  *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing

12.04(C)(2).  The regulations further indicate that an individual can demonstrate impaired social

functioning with evidence of avoidance of interpersonal relationships or social isolation.  *See id.*

In concluding that McLoskey has only a mild limitation in this area, the ALJ said:

> In terms of social functioning, the claimant testified that he prefers to
> isolate himself and be alone.  However, his Function Reports reveal that
> he is very respectful of authority figures, is able to attend family functions,
> and spends time with others a few times a week. (Exhibits 4E and 6E).  It
> is also imperative to note that he lives with his parents and has never
> reported difficulty getting along with them.  In fact, very recently, he
> admitted that he was making an effort to spend more time with his parents.
> It should also be noted that he consistently presented to his psychiatrists as
> cooperative and pleasant.  Accordingly, he has no more than a mild
> limitation for social functioning.

(Tr. 39).

Again, despite the fact that the ALJ cites to Ms. McLoskey's third-party function report,

19

she has taken her statements out of context and minimized their import.  For example, the ALJ cites reports completed by both McLoskey and his ex-wife for the proposition that McLoskey "is able to attend family functions, and spends time with others a few times a week."  (Tr. 39).  In reality, however, McLoskey indicated in the cited report that he goes "nowhere" on a regular basis, has problems getting along with friends and family, and seems "to be doing a lot less socially."  (Tr. 212-13).  Similarly, Ms. McLoskey indicated that, for the previous 3 ½ years, McLoskey did not go outside; he "became a hermit" and would only leave for family functions or holidays and would then "want to leave immediately."  (Tr. 187-88).  Moreover, while the ALJ states that McLoskey "admitted that he was making an effort to spend more time with his parents" (Tr. 39), what McLoskey, in fact, said was that he was "working on trying to spend more time with his parents *even though he wants to be alone most of the time*" (Tr. 432 (emphasis added)).  Indeed, other treatment notes from McLoskey's medical providers indicate that he "gets moody very irritable easily and then isolate[s]" and "spend[s] a lot of time alone in his room," (Tr. 324, 434).  And, Dr. Tripi noted in her consultative report that he "mainly stays at home … has no friends and is fairly isolated from his parents."  (Tr. 368).  Thus, the ALJ's conclusion that McLoskey is only mildly limited in maintaining social functioning is not supported by substantial evidence.  *See, e.g., Grabowski*, 2014 WL 5817210, at *6 (finding plaintiff markedly limited in maintaining social functioning where she spent most of the day alone in her room and was "paranoid about being out in the community around other people," despite the fact that she babysat and talked on the phone with others).

The third area of function evaluated under the "paragraph B" criteria is concentration, persistence, or pace, which refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in

work settings."  20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.04(C)(3).  In concluding that

McLoskey is only mildly limited in this area, the ALJ said:

> The claimant indicated that his symptoms, especially his sleep deficits, interfere with his ability to maintain attention and concentration. However, it appears his concentration and sleep difficulties were the result of a high dosage of Lithium.  Once he went back down to a lower dosage, he admitted that his sleep was stable.  Further, Drs. Bagga and Athar consistently noted that claimant's attention and concentration were within normal limits.  The claimant also admitted that he is capable of driving to and from therapy appointments and even drove by himself from his home to the hearing, which was about a forty-five minute drive.  He also failed to testify to any difficulties maintaining attention and concentration when he plays his guitar.  It is reasonable to assume that, if he is capable of sustaining adequate concentration, pace and persistence to operate a motor vehicle, he could maintain the focus required for unskilled, simple, routine and repetitive tasks.

(Tr. 39).

In this area too, the ALJ appears to have impermissibly focused on only the portion of the

record which supported her conclusions while failing to adequately address other significant

record evidence which detracts from those conclusions.  *See Trudell ex rel. Bushong v. Apfel*,

130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("Substantiality of the evidence must be based upon

the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great

deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the

record fairly detracts from its weight.") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir.

1984)); *see also Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000) (substantial

evidence "cannot be based on fragments of the record").  For example, the ALJ's analysis

suggests that McLoskey had difficulty sleeping (which interfered with his ability to pay attention

and concentrate) only when taking a high dosage of lithium and that, after this dosage was

lowered, he no longer had difficulty sleeping.  In reality, however, record evidence indicates that

McLoskey had trouble sleeping long before his lithium dose was increased (apparently in

February 2012).  Specifically, Dr. Bagga noted in March 2011 that McLoskey has a history of manic episodes where he "cannot concentrate, cannot focus, and cannot sleep"; later that month, McLoskey's wife sought help on his behalf, indicating that he was "not sleeping"; in May 2011, McLoskey reported having had a breakdown the month before, when he "didn't sleep for 3 days." (Tr. 313, 324, 339).  Moreover, the ALJ's conclusion that McLoskey's concentration improved after his lithium dosage was lowered is also contradicted by the record evidence: McLoskey specifically indicated on February 28, 2012 – after taking a lower dose of lithium – that, although his symptoms had improved somewhat, he "continues to hear voices," which he testified makes it very difficult for him to focus and concentrate.  (Tr. 75-76, 438).  Thus, contrary to the ALJ's conclusion, it was not merely a temporary increase in McLoskey's lithium dosage which briefly caused difficulty sleeping and concentrating.

The ALJ committed similar errors when addressing other aspects of McLoskey's claim. For example, the ALJ stated that, "While [McLoskey] stated that he lost several jobs due to excessive absences, auditory hallucinations, paranoia, and inability to cope, deal with others, or sit at his desk all day, there is no evidence to substantiate this allegation."  (Tr. 34).  In truth, however, such evidence does exist in the record, in the form of McLoskey's own sworn testimony, statements made in both his and his ex-wife's function reports, observations made by his medical providers, and his earnings records.  (*E.g.,* Tr. 57-59, 151-54, 191, 209, 214, 375).

Similarly, the ALJ discounted McLoskey's report to Dr. Bagga in May 2011 that he had had a breakdown "about a month" before, during which he had not slept for three days and had gone "into his own world."  (Tr. 35 (citing Tr. 313)).  Specifically, the ALJ found "absolutely no evidence" of this alleged breakdown, and stated that, "Treatment notes from April 2011 very clearly state that he was doing fine with better sleep, less paranoia and delusions, and absence of

racing thoughts and hyperactivity." (Tr. 35). Although notes from McLoskey's April 13, 2011, visit to Easter Seals do indicate that he was "[d]oing much better" (Tr. 322), notes from March 29, 2011 – a mere six weeks before McLoskey reported a breakdown – indicate that his wife had called Easter Seals, reporting that he was "not sleeping," was "hyper irritable," had "vague thinking," and was also "tangential." (Tr. 324). On examination, McLoskey was aloof and anxious with a labile affect and tangential thinking. (Tr. 326). Thus, the ALJ's observation that there was "absolutely no evidence" of an alleged breakdown in this timeframe is belied by the record.

Finally, and perhaps most importantly, it appears to the Court that the ALJ relied largely on evidence from 2009 and 2010, and failed to consider that throughout the course of 2011 and 2012, McLoskey's condition appeared to steadily worsen. Although McLoskey indicated that his symptoms were "stable" on November 29, 2010 (Tr. 355), Dr. Bagga increased his dose of lithium on March 16, 2011 in order to "keep him stabilized in the community and avoid decompensation." (Tr. 339). Just two weeks later, Ms. McLoskey called Easter Seals, worried about her husband, who was "not sleeping," "tangential," expressed feeling as though he were a "tuning fork," and was making gestures in the air "like writing." (Tr. 324). At a May 26, 2011, medication review, McLoskey's hygiene was poor, he was hyperactive with a labile affect, and he reported experiencing auditory hallucinations, as well as "paranoia that people are trying to control him." (Tr. 301). McLoskey's clinical status was described as unstable, and his Ativan dosage was temporarily increased in order to avoid hospitalization. (Tr. 301, 304). At his TTI intake visit in November 2011, McLoskey reported an incident earlier that year when he took 35 Ativan (although he claimed this was not a suicide attempt). (Tr. 462). On February 23, 2012, McLoskey indicated that he was "starting to hear voices" which "sometimes could be the TV but

23

he feels that the TV is talking to him specifically."  (Tr. 447).  McLoskey continued to report hearing voices at a subsequent visit to Dr. Athar on February 28, 2012 (Tr. 438); the next day, he told his case manager the he felt he had "multiple personality disorder because he is hearing a lot of voices and they all have different sounds and personalities" (Tr. 436).  Records indicate that McLoskey attempted suicide for a second time in February 2012.  (Tr. 367).

The ALJ should have provided a thorough discussion of these substantial medical records – which span more than a year and appear to demonstrate McLoskey's disintegrating mental status – as this evidence could well support a finding that McLoskey became disabled at some point during the relevant period, even if substantial evidence supports a conclusion that he was not disabled up to that particular point.[4]

In sum, because the ALJ failed to properly identify and weigh the foregoing evidence against other evidence on which she relied for her conclusions, the Court cannot find the ALJ's conclusion that McLoskey is only mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace to be supported by substantial evidence.[5]  *See Trudell*, 130 F. Supp. 2d at 895; *Garner*, 745 F.2d at 388; *Laskowski*, 100 F.

---

[4] Two issues make this deficiency particularly acute.  First, at the hearing before the ALJ, McLoskey candidly admitted that his selection of the September 11, 2009 alleged onset date was "arbitrary [as he had] been having problems on and off throughout [his] adult life."  (Tr. 56-57). This is more reason to pay careful attention to the entirety of the medical record, including the most recent records which were before the ALJ, rather than focusing almost exclusively on the ones nearest the alleged onset date.   Second, and relatedly, McLoskey alleges (and the Commissioner does not deny) that his subsequent application for benefits was granted at the initial application level, resulting in an award of full benefits dating back to December 26, 2012 (the date of his request for review in the instant case).  *See supra* fn. 3.  Again, although that fact was not before the ALJ at the time she issued her decision, it does highlight the need to thoroughly examine whether McLoskey's disability extends to any point earlier than December 26, 2012.

[5] The Commissioner argues that the ALJ's decision that McLoskey's impairments do not meet or medically equal Listing 12.04 is supported by the opinion of Dr. Biscardi, the state agency reviewing psychologist.  (Doc. #19 at 12-13 (citing Tr. 87)).  In his opinion, Dr. Biscardi found

Supp. 2d at 482. Because a finding that McLoskey is markedly limited in two or more of these areas would result in a finding that he is presumptively disabled at Step Three, the Court cannot say that the ALJ's errors were harmless, and remand is appropriate. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.04.[6] Moreover, the ALJ should specifically address whether McLoskey became disabled at any point during the relevant period.

## III.  CONCLUSION

For foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [19] be DENIED, McLoskey's Motion for Summary Judgment [17] be GRANTED IN PART to the extent it seeks remand, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: June 19, 2015                              s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                          United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

---

that McLoskey's mental impairments are not severe and, thus, by implication, that they do not meet or medically equal a listed impairment. (Tr. 87). The Court notes, however, that the ALJ gave only "moderate weight" to Dr. Biscardi's opinion because "it was completed before all records were in evidence." (Tr. 38). More importantly, Dr. Biscardi's opinion appears to be wholly at odds with the substantial evidence described above that McLoskey suffers from severe and ongoing mental impairments. Thus, the Court finds no merit to the Commissioner's contention in this regard.

[6] McLoskey makes several other arguments before this Court, including arguments that the ALJ erred in discounting his credibility and in giving little weight to Dr. Tripi's June 2012 medical opinion. (Doc. #17 at 28-32). Because the Court is remanding on other grounds, it need not consider the merits of these arguments.

provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 19, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager